Steven G. LOUGH, Plaintiff–Appellee,

v.

BRUNSWICK CORPORATION, d/b/a Mercury Marine, Defendant–Appellant.

Nos. 95–1266, 95–1302, 95–1314.

United States Court of Appeals,
Federal Circuit.

June 12, 1996.

George H. Solveson, Andrus, Sceales, Starke & Sawall, Milwaukee, Wisconsin, ar-

gued, for defendant-appellant. With him on the brief, was Edward R. Williams, Jr.

Richard R. Garland, Dickinson & Gibbons, P.A., Sarasota, Florida, argued, for plaintiff-appellee. With him on the brief, were Arnold B. Silverman, and Kirk D. Houser, Eckert Seamans Cherin & Mellott, Pittsburgh, Pennsylvania. Also on the brief, was Ward E. Dahlgren, Dickinson & Gibbons, P.A. Of counsel, was George K. Stacey, Eckert Seamans Cherin & Mellott.

Before PLAGER, LOURIE, and CLEVENGER, Circuit Judges.

Opinion for the court filed by Circuit Judge LOURIE. Dissenting opinion filed by Circuit Judge PLAGER. Additional remarks filed by Circuit Judge LOURIE, with whom Circuit Judge CLEVENGER joins.

LOURIE, Circuit Judge.

Brunswick Corporation, d/b/a Mercury Marine, appeals from the final judgment of the United States District Court for the Middle District of Florida in which the court denied Brunswick's Motion for Judgment as a Matter of Law and its Motion for New Trial after a jury verdict of infringement of U.S. Patent 4,848,775, owned by the inventor Steven G. Lough.[1] Because the court erred in denying Brunswick's Motion for Judgment as a Matter of Law, we reverse in part and vacate in part.

## BACKGROUND

Stern drives are marine propulsion devices for boats in which the engine is located inside the boat and is coupled to an outdrive, which includes a propeller located outside the boat ("inboard/outboard boat"). A typical stern drive arrangement is illustrated below.[2]

1. *Lough v. Brunswick Corp.*, No. 92–799–CIV–T–21A (M.D.Fla. Feb. 13, 1995) (amended judgment); *Lough v. Brunswick Corp.*, No. 92–799–CIV–T–21A (M.D.Fla. Mar. 27, 1995) (second amended judgment); *Lough v. Brunswick Corp.*, No. 92–799–CIV–T–21A (M.D. Fla. April 13, 1995) (permanent injunction).

2. This figure is reproduced from U.S. Patent 5,052,958, "Marine Drive for Easier Shifting," which is assigned to Brunswick.

Fe(

The outdrive is housed in a drive shaft housing (20), which includes an aluminum bell housing (22). A propeller (28) is located at the lower end of the outdrive and is driven by the engine through a system of shafts (18, 24, and 26). The stern drive (10) includes a shifting system for placing the outdrive in forward, reverse, or neutral gear. As part of the shifting system, a gear shift shaft assembly (34) extends between a shift lever, which is connected through a gear shift cable to user controls for throttle and gear selection, and a clutch (42), which controls forward and reverse gears (44 and 46). At the upper and lower ends of the gear shift shaft assembly (34), an upper seal assembly and a lower seal assembly prevent sea water and exhaust from causing corrosion by passing through the bell housing apertures provided for the shift shaft assembly (34). The lower seal assembly protects the gear controls at the lower end of the shift shaft (34), and the upper seal assembly protects the gear shift cable and user controls.

In 1986, Steven G. Lough worked as a repairman for a boat dealership in Sarasota, Florida. While repairing Brunswick inboard/outboard boats, he noticed that the upper seal assembly in the stern drives often failed due to corrosion. A typical upper seal assembly from a Brunswick motor is shown below.

The upper seal assembly comprises a brass bushing (D) and an annular seal (E). The brass bushing (D) is forced into a bell housing aperture (C). An annular seal (E) is installed below the brass bushing (D) and is in direct contact with the aluminum bell housing (B).

Lough determined that the corrosion in the upper seal assembly occurred due to contact between the annular seal (E) and the bell housing aperture (C). He designed a new upper seal assembly that isolated the annular seal (E) from the aluminum bell housing (B) in order to prevent such corrosion.

After some trial and error with his grandfather's metal lathe, he made six usable prototypes in the spring of 1986. He installed one prototype in his own boat at home. Three months later, he gave a second prototype to a friend who installed it in his boat. He also installed prototypes in the boat of the owner of the marina where he worked and in the boat of a marina customer. He gave the remaining prototypes to longtime friends who were employees at another marina in Sarasota. Lough did not charge anyone for the prototypes. For over a year following the installation of these prototypes, Lough neither asked for nor received any comments about the operability of the prototypes. During this time, Lough did not attempt to sell any seal assemblies.

On June 6, 1988, Lough filed a patent application entitled "Liquid Seal for Marine Stern Drive Gear Shift Shafts," which issued as the '775 patent on July 18, 1989. Figure 4 of the patent illustrates the preferred embodiment of the invention and is shown below.

Claim 1, with reference letters and numbers to figure 4 added, is representative of the claims at issue:

1. A liquid seal [10] structured to provide a watertight barrier between adjacent the upper end of an elongated gear shift shaft [A] in a marine stern drive system and an aperture [C] in the stern drive bell housing [B], the aperture [C] located between the exhaust passageway and the parallel adjacent gimbal passageway of the bell housing [B], the aperture for receiving the upper end of the gear shift shaft [A] installed therethrough, said liquid seal [10] comprising:

   a rigid bushing [12] having coaxial upper [18] and lower portions [14];

   said upper portion [18] having a first outer surface structured to be sealably urged into the bell housing aperture [C] to form a watertight junction therebetween and thusly positioning said lower portion [14] against the top surface of the exhaust passageway;

   said upper portion [18] also having a longitudinal shift shaft aperture [20] generally concentric with and extending along the length of said upper portion [18] structured to supportively receive the upper end of the gear shift shaft [A] for supportive rotation therein;

said lower portion [14] having a second outer surface [21] radially larger than said first outer surface and positioned in the exhaust passageway and a generally concentric seal cavity [16] continuous with, and larger than, said shift shaft aperture [20] extending along the length of said lower portion [14];

at least one annular seal [22] structured to have its outer surface sealably urged into said seal cavity [16] to form a watertight junction therebetween and to have its inner surface coaxial with said second outer surface and sealably mate against the cylindrical surface of the upper end of the gear shift shaft [A].

After learning of Lough's invention, Brunswick designed its own improved upper seal

assembly. This upper seal assembly is shown below:

Seal Cavity

Bushing

Shaft

Seal

In addition to a bushing with an upper and lower portion, Brunswick's upper seal assembly included its own patented gap technology.[3] This gap spaced the upper portion of the bushing from the shift shaft to alleviate crushing that might otherwise occur due to corrosion between the bushing and the bell housing. Brunswick incorporated its new upper seal assembly in its "Alpha One" inboard/outboard boat. In addition, it sold this seal assembly as a replacement part under its "Quicksilver" line of replacement parts.

Lough sued Brunswick on June 12, 1993, alleging infringement of the '775 patent. Brunswick counterclaimed for a declaratory judgment of patent noninfringement, invalidity, and/or unenforceability. A jury found that Brunswick failed to prove that Lough's invention was in public use before the critical date on June 6, 1987, one year prior to the filing date of the '775 patent. The jury also found that Brunswick infringed claims 1–4 of the '775 patent, both literally and under the doctrine of equivalents. Based on its infringement finding, the jury awarded Lough $1,500,000 in lost profits. After trial, Brunswick filed a Motion for Judgment as a Matter of Law in which it argued, *inter alia*, that the claimed invention was invalid because it had been in public use before the critical date. Brunswick also filed a Motion for New Trial on damages. The court denied Brunswick's motions without any comment. *Lough v. Brunswick Corp.*, No. 92–799–CIV–T–21A (M.D.Fla. Feb. 13, 1995). Brunswick appeals.

3. Brunswick is the assignee of U.S. Patent 5,052,958 for a "Marine Drive with Easier Shifting." The '958 patent relates to an intermediate bushing that provides a seal between an aperture in the bell housing and an intermediate point along the shift shaft. The patent claims provide for a gap between the intermediate bushing and the shift shaft. This gap prevents binding of the shift shaft when corrosion between the intermediate bushing and the aperture causes the bushing to contract radially inward toward the shift shaft. The '958 patent does not disclose the use of the gap technology in an upper seal assembly.

## DISCUSSION

■ When a party moves for JMOL in a case tried to a jury, we review *de novo* the district court's decision by reapplying the JMOL standard. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd on other grounds,* — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). Judgment as a matter of law against a winning party is appropriate when that "party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Fed.R.Civ.P. 50(a)(1). We also review the legal standards that the jury applied in reaching its verdict to determine whether they were correct as a matter of law. *Id.* When a legal issue is submitted to a jury without an objection, we treat the jury's verdict on the legal issue as a resolution of all genuinely disputed underlying factual issues in favor of the verdict winner. *Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1562 n. 3, 28 USPQ2d 1081, 1085 n. 3 (Fed. Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). We review the jury's resolution of all factual disputes for substantial evidence. *Markman,* 52 F.3d at 975, 34 USPQ2d at 1326.

Brunswick challenges, *inter alia,* the court's denial of its motion for JMOL on the issue of public use. Brunswick argues that the district court erred in denying its motion for JMOL because the uses of Lough's prototypes prior to the critical date were not experimental. Brunswick asserts that Lough did not control the uses of his prototypes by third parties before the critical date, failed to keep records of the alleged experiments, and did not place the parties to whom the seals were given under any obligation of secrecy. Based on this objective evidence, Brunswick argues that the uses of Lough's prototypes before the critical date were not "experimental." Therefore, Brunswick contends that the jury's verdict was incorrect as a matter of law and that the court erred in denying its JMOL motion.

Lough counters that the tests performed with the six prototypes were necessary experiments conducted in the course of completing his invention. He argues that when the totality of circumstances is properly viewed, the evidence supports the jury's conclusion that those uses were experimental. Lough maintains that a number of factors support the jury's experimental use conclusion, including evidence that he received no compensation for the prototypes, he did not place the seal assemblies on sale until after he filed his patent application, and he gave the prototypes only to his friends and personal acquaintances who used them in such a manner that they were unlikely to be seen by the public. He further argues that, to verify operability of the seal assemblies, prototypes had to be installed by mechanics of various levels of skill in boats that were exposed to different conditions. Thus, he asserts that the court did not err in denying Brunswick's JMOL motion. We disagree with Lough.

■ One is entitled to a patent unless, *inter alia,* "the invention was ... in public use ... in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1994). We have defined "public use" as including "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith,* 714 F.2d 1127, 1134, 218 USPQ 976, 983 (Fed.Cir. 1983) (citing *Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755 (1881)). An evaluation of a question of public use depends on "how the totality of the circumstances of the case comports with the policies underlying the public use bar." *Tone Bros. v. Sysco Corp.,* 28 F.3d 1192, 1198, 31 USPQ2d 1321, 1324 (Fed.Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). These policies include:

(1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Id.,* 28 F.3d 1192, 1198, 31 USPQ2d at 1324–25. A patentee may negate a showing of public use by coming forward with evidence that its use of the invention was experimental. *See TP Lab. v. Professional Positioners, Inc.,* 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.) ("[I]f a *prima facie* case is made of public use, the patent owner must be able to point to or must come forward with convincing evidence to counter that showing."), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984).

■ Neither party disputes that Lough's prototypes were in use before the critical date. Thus, both parties agree that the issue presented on appeal is whether the jury properly decided that the use of Lough's six prototypes in 1986, prior to the critical date, constituted experimental use so as to negate the conclusion of public use.[4] Whether an invention was in public use prior to the critical date within the meaning of § 102(b) is a question of law. *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed.Cir.1990).

"The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use." *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1877). This doctrine is based on the underlying policy of providing an inventor time to determine if the invention is suitable for its intended purpose, in effect, to reduce the invention to practice. *See id.* at 137 ("It is sometimes said that an inventor acquires an undue advantage over the public by delaying to take out a patent . . . but this cannot be said with justice when the delay is occasioned by a *bona fide* effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended."); *see also RCA Corp. v. Data General Corp.,* 887 F.2d

1056, 1061, 12 USPQ2d 1449, 1453 (Fed.Cir. 1989) ("[E]xperimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice."). If a use is experimental, it is not, as a matter of law, a public use within the meaning of section 102.

■ To determine whether a use is "experimental," a question of law, the totality of the circumstances must be considered, including various objective indicia of experimentation surrounding the use, such as the number of prototypes and duration of testing, whether records or progress reports were made concerning the testing, the existence of a secrecy agreement between the patentee and the party performing the testing, whether the patentee received compensation for the use of the invention, and the extent of control the inventor maintained over the testing. *See TP Laboratories,* 724 F.2d at 971–72, 220 USPQ at 582; *see also Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494, 498, 25 USPQ2d 1290, 1294 (Fed. Cir.1992) (listing objective evidence to be considered to determine if use is "experimental"), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 256 (1993); *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564, 4 USPQ2d 1210, 1214 (Fed.Cir.1987) (same). The last factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting.

In order to justify a determination that legally sufficient experimentation has occurred, there must be present certain minimal indicia. The framework might be quite

---

**4.** The trial judge instructed the jury as follows:

The law requires that an inventor must file a patent application within one year after his invention is publicly used. Public use means any use of Mr. Lough's invention by any person other than Mr. Lough who was not limited or restricted in their activities regarding the invention, or not obligated to secrecy by Mr. Lough. Such use, however does not invalidate Mr. Lough's patent if the use was primarily for bona fide experimental purposes.

. . . .

. . . The parties do not dispute that the five seal assemblies were used by others before June 6, 1987. *The only dispute is whether these uses qualify as experimental uses. The law places the burden on Mr. Lough to come forward with convincing evidence showing that these uses were experimental uses* [emphasis added].

formal, as may be expected when large corporations conduct experiments, governed by contracts and explicit written obligations. When individual inventors or small business units are involved, however, less formal and seemingly casual experiments can be expected. Such less formal experiments may be deemed legally sufficient to avoid the public use bar, but only if they demonstrate the presence of the same basic elements that are required to validate any experimental program. Our case law sets out these elements. *See TP Laboratories,* 724 F.2d at 971–72, 220 USPQ at 582; *Baker Oil Tools,* 828 F.2d at 1564, 4 USPQ2d at 1214. The question framed on this appeal is whether Lough's alleged experiments lacked enough of these required indicia so that his efforts cannot, as a matter of law, be recognized as experimental.

■ Here, Lough either admits or does not dispute the following facts. In the spring of 1986, he noted that the upper seal assembly in Brunswick inboard/outboard boats was failing due to galvanic corrosion between the annular seal and the aperture provided for the upper seal assembly in the aluminum bell housing. He solved this problem by isolating the annular seal from the aluminum bell housing in order to prevent corrosion. After some trial and error, Lough made six prototypes. He installed the first prototype in his own boat. Lough testified at trial that after the first prototype had been in his boat for three months and he determined that it worked, he provided the other prototypes to friends and acquaintances in order to find out if the upper seal assemblies would work as well in their boats as it had worked in his boat. Lough installed one prototype in the boat of his friend, Tom Nikla. A prototype was also installed in the boat of Jim Yow, co-owner of the dealership where Lough worked. Lough installed a fourth prototype in one of the dealership's customers who had considerable problems with corrosion in his stern drive unit. The final two prototypes were given to friends who were employed at a different marina in Florida. These friends installed one prototype in the boat of Mark Liberman, a local charter guide. They installed the other prototype in a demonstration boat at their marina. Subsequently, this boat was sold. Neither Lough nor his friends knew what happened with either the prototype or the demonstration boat after the boat was sold. After providing the five prototypes to these third parties, Lough neither asked for nor received any comments concerning the operability of these prototypes.

Accepting that the jury found these facts, which either were undisputed or were as asserted by Lough, it cannot be reasonably disputed that Lough's use of the invention was not "experimental" so as to negate a conclusion of public use. It is true that Lough did not receive any compensation for the use of the prototypes. He did not place the seal assembly on sale before applying for a patent. Lough's lack of commercialization, however, is not dispositive of the public use question in view of his failure to present objective evidence of experimentation. Lough kept no records of the alleged testing. *See Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.,* 984 F.2d 1182, 1188, 25 USPQ2d 1561, 1566 (Fed.Cir.1993) ("[W]hen further combined with other factors, such as the inventor's failure to keep test records, the entire surrounding circumstances point to only one possible legal conclusion—that the sales [of the patented device] were commercial in nature and fall within the statutory bar."); *Sinskey,* 982 F.2d at 499, 25 USPQ2d at 1294 (relying on patentee's failure to introduce medical records that would likely indicate that use of medical device was experimental). Nor did he inspect the seal assemblies after they had been installed by other mechanics. *See In re Hamilton,* 882 F.2d 1576, 1581–83, 11 USPQ2d 1890, 1894–96 (Fed.Cir.1989) (lack of involvement by inventor in alleged testing is an important factor in determining that use was not experimental). He provided the seal assemblies to friends and acquaintances, but without any provision for follow-up involvement by him in assessment of the events occurring during the alleged experiments, and at least one seal was installed in a boat that was later sold to strangers. Thus, Lough did not maintain any supervision and control over the seals during the alleged testing. *See Beachcombers v. WildeWood Creative*

*Prods.,* 31 F.3d 1154, 1160, 31 USPQ2d 1653, 1657–58 (Fed.Cir.1994) (sustaining jury's finding of public use based on inventor's failure to control use of the patented device and the future dissemination of information about it); *Hamilton,* 882 F.2d at 1580, 11 USPQ2d at 1893 ("The Supreme Court [in *City of Elizabeth* ] has indicated that for an assertion of experimental use to have merit, it must be clear that the inventor kept control over his invention in the course of its testing.").

Lough argues that other evidence supports a finding that his uses were experimental, including his own testimony that the prototypes were installed for experimental purposes and the fact that the prototypes were used in such a manner that they were unlikely to be seen by the public. However, "the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value." *TP Laboratories,* 724 F.2d at 972, 220 USPQ at 583. In addition, the fact that the prototypes were unlikely to be seen by the public does not support Lough's position. As the Supreme Court stated in *Egbert v. Lippmann:*

> [S]ome inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cogwheel covered from view in the recesses of a machine for spinning or weaving. Nevertheless, if its inventor sells a machine of which his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one.

104 U.S. at 336. Moreover, those to whom he gave the prototypes constituted "the public," in the absence of meaningful evidence of experimentation. Thus, we find Lough's reliance on this additional evidence to be of minimal value when viewed in light of the totality of the other circumstances surrounding the alleged experimentation.

We therefore hold that the jury had no legal basis to conclude that the uses of Lough's prototypes were experimental and that the prototypes were not in public use prior to the critical date. Our holding is consistent with the policy underlying the experimental use negation, that of providing an inventor time to determine if the invention is suitable for its intended purpose, *i.e.,* to reduce the invention to practice. Lough's activities clearly were not consistent with that policy. We do not dispute that it may have been desirable in this case for Lough to have had his prototypes installed by mechanics of various levels of skill in boats that were exposed to different conditions. Moreover, Lough was free to test his invention in boats of friends and acquaintances to further verify that his invention worked for its intended purpose; however, Lough was required to maintain some degree of control and feedback over those uses of the prototypes if those tests were to negate public use. *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). Lough's failure to monitor the use of his prototypes by his acquaintances, in addition to the lack of records or reports from those acquaintances concerning the operability of the devices, compel the conclusion that, as a matter of law, he did not engage in experimental use. Lough in effect provided the prototype seal assemblies to members of the public for their free and unrestricted use. The law does not waive statutory requirements for inventors of lesser sophistication. When one distributes his invention to members of the public under circumstances that evidence a near total disregard for supervision and control concerning its use, the absence of these minimal indicia of experimentation require a conclusion that the invention was in public use.

We conclude that the jury's determination that Lough's use of the invention was experimental so as to defeat the assertion of public use was incorrect as a matter of law. The court thus erred in denying Brunswick's JMOL motion on the validity of claims 1–4 of the '775 patent under § 102(b).[5]

---

**5.** Each claim of the patent must be considered individually when evaluating a public use bar.

However, Lough did not argue lack of public use on a claim-by-claim basis at trial. Nor does he

Brunswick also challenges the district court's failure to grant JMOL or a new trial on the issues of noninfringement, obviousness, and damages. Our holding that the patent is invalid under § 102(b), as a practical matter, eliminates the need to consider these matters. Thus, we will not address them. We are of course mindful of the Supreme Court's decision in *Cardinal Chemical Co. v. Morton International, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 USPQ2d 1721 (1993). In *Cardinal*, the Court rejected our previous practice of vacating invalidity judgments following a determination of noninfringement. 508 U.S. at 102–03, 113 S.Ct. at 1978–79, 124 L.Ed.2d 1, 26 USPQ2d at 1730. In doing so, the Court emphasized the importance to the public of resolving questions of patent validity and the need to prevent parties from having to relitigate patent validity. *Id.* at 99–101, 113 S.Ct. at 1976 , 124 L.Ed.2d 1, 26 USPQ2d at 1729. Here, however, we have determined that the patent is invalid. We are not reviving a patent twice previously held invalid, as in *Cardinal*. Invalidity is a complete defense to infringement and, assuming the Supreme Court does not reverse or vacate our invalidity holding, a statistically unlikely event, our decision resolves all issues that are meaningful in this case. No further public interest is served by our resolving an infringement question after a determination that the patent is invalid. We therefore decline to consider the issue of infringement as well as that of obviousness.

## CONCLUSION

The district court's denial of Brunswick's motion for JMOL on the ground of invalidity is reversed. The award of damages is accordingly vacated.

## COSTS

No costs.

do so on appeal. Moreover, section 102(b) may create a bar to patentability either alone, if the device used in public is an anticipation of the later claimed invention or, in conjunction with 35 U.S.C. § 103, if the differences between the claimed invention and the device used would

*REVERSED–IN–PART AND VACATED–IN–PART*

PLAGER, Circuit Judge, dissenting.

I respectfully dissent. In my view, the panel majority confuses its role as law-giver and law-reviewer with the role of fact-weigher and fact-decider. The majority and I agree that the issue is not whether the trial court applied the wrong law (it did not), or whether the jury was wrongly instructed (it was not). As the panel majority correctly notes, the issue is whether, on the totality of the circumstances, Mr. Lough was engaged in "a bona fide effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended," *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 137, 24 L.Ed. 1000 (1877), or whether he was engaged in selling or, on the facts of this case oddly enough for a working mechanic, giving away his invention to members of the public.

This is not a contest between Evinrude (Outboard Marine Corporation) and Mercury Marine (Brunswick), the two big competitors in this field, to see who can market a better engine. If it were, we could expect the combination of engineering and legal staffs on each side to be punctilious about observing the niceties of our prior opinions on how to conduct experiments so as to avoid any possible running afoul of the public use bar. No, this is a home-made improvement by a man with only a high school education who worked on boats and boat engines, including his own, where he kept encountering the problem with these shaft seals that Mercury Marine had failed to solve. He solved it by trial and error, with an ingenious bushing of his own design, and, on his grandfather's metal lathe, after several tries, fashioned a half-dozen prototype seals that looked like they might do the job.

He put one in his own boat, one in the boat of a close friend, one in the boat of the co-owner of the marine repair shop where he

have been obvious to one skilled in the art. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1071, 22 USPQ2d 1025, 1028 (Fed.Cir.1992). Thus, our holding with regard to the public use of the invention applies equally to all of the claims of the '775 patent.

worked, and later put one in the boat of a customer of the shop who was having considerable problems with his stern drive because of the seal difficulty. He gave two to mechanic friends at another marina so they could put them in boats having the same troublesome seal problem, with the understanding they would be used to test the seals in different equipment.

Of course it would have been better for all concerned (except perhaps for Mercury Marine) if Mr. Lough had read our prior opinions before he became an inventor. Then he might have kept detailed lab notes setting out the problem and the possible solutions, and he wisely would have obtained written confidentiality agreements from those allowed to see or use his prototypes. Had he studied our cases first, he no doubt would have developed a detailed questionnaire for the persons to whom he provided the seals, and he would have insisted on periodic written reports. In other words, he would have put in the set of tight controls the majority would have wanted. Instead, he did what seemed appropriate in the setting in which he worked: he waited to hear from his test cases what problems might emerge, and, hearing none, at least none that convinced him he was on the wrong track, he accepted some friendly advice and proceeded to patent his invention.

Yes, he failed to conduct his testing, his experiments, with the careful attention we lawyers, with our clean and dry hands, have come to prefer. But, under all the facts and circumstances, it is more likely than not that he was testing and perfecting his device, rather than simply making it available gratis to members of the general public for what the law calls "public use." The most that can be said for the majority view is that this is a close question under the totality of circumstances. The ultimate question of what is public use under 35 U.S.C. § 102(b) may be a question of law, but in a given case in which the issue is whether *in fact* the challenged

use was experimental (a complete answer to an infringer's defense based on a § 102(b) violation), the issue involves a blend of law and fact. This issue, unlike claim construction, is one in which a jury fully participates. Thus the question before us is not whether, on the facts, we are persuaded Lough retained all the control a well-designed test of the seals would have afforded, but whether a reasonable jury, on all the evidence before it, could have arrived at the conclusion it did. *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1577, 35 USPQ2d 1840, 1845 (Fed.Cir.1995) (finding a grant of JNOV improper because "a reasonable jury could have found, applying the correct law, that there was not a public use bar under § 102(b)"). The jury chose to accept Lough's view of the events, and under that view there was more than enough evidence to support a jury finding that he was testing and perfecting his invention during much of the period leading up to the time he applied for his patent.[1] As we said in *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 551, 16 USPQ2d 1587, 1592 (Fed.Cir. 1990): "When durability in an outdoor environment is inherent to the purpose of an invention, then further testing to determine the invention's ability to serve that purpose will not subject the invention to a section 102(b) bar." (citing *City of Elizabeth*, 97 U.S. at 133–34).

Many of the cases cited by the majority in support of their position are cases in which the inventor made a sale or an offer to sell the product prior to the critical date. *See, e.g., RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 12 USPQ2d 1449 (Fed.Cir.1989); *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 25 USPQ2d 1290 (Fed.Cir.1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 256 (1993); *Paragon Podiatry Lab., Inc., v. KLM Lab., Inc.*, 984 F.2d 1182, 25 USPQ2d 1561 (Fed.Cir.1993); *In re Hamilton*, 882 F.2d 1576, 11 USPQ2d 1890 (Fed. Cir.1989). The record in this case is undis-

---

**1.** The law of this circuit is unequivocal that a "party attacking validity has the burden of proving facts supporting a conclusion of invalidity by clear and convincing evidence." *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1423, 8 USPQ2d 1323, 1327 (Fed.Cir.1988). Whatever the shifting of the burden of production of evidence at trial may have occurred, the ultimate burden remains with the attacker. The jury verdict leaves no question that Mercury Marine failed to carry its burden.

puted that Lough made no sales of his invention until after his patent application was filed. Nor was this simply market testing, rather than product testing, as in *In re Smith*, .714 F.2d 1127, 218 USPQ 976 (Fed. Cir.1983); and in any event, that was part of the issue presented to the jury.

There is no dearth of cases in this court in which inventors tested their products in various ways before various audiences, and in which we have held that such testing, when it made sense in light of the circumstances, did not constitute public use under section 102(b). *See, e.g., Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321 (Fed.Cir. 1994) (students asked to test functional features of spice containers prior to the critical date; summary judgment of invalidity reversed), *cert. denied*, —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *TP Lab., Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 220 USPQ 577 (Fed.Cir.) (orthodontic devices tested on patients prior to critical date; held not invalid even though a fee paid by the patients), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984); *Manville Sales Corp.*, 917 F.2d 544, 16 USPQ2d 1587 (testing of streetlight, conditionally approved for sale, at outdoor site held experimental); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 229 USPQ 805 (Fed.Cir.1986) (inventor of puzzle showed it to a few close colleagues, and allowed one person to use it, prior to the critical date; held not invalid.), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

Under our standard of review, the jury's decision to accept Lough's version of the case is not properly subject to reversal. The trial court correctly denied Brunswick's JMOL motion, and this court should affirm that denial.

The majority, by unilaterally invalidating the patent on the public use issue, confesses that it thus avoids the knotty problem of how to deal with the infringement question, especially infringement under the doctrine of equivalents. Although I share my colleagues' unease at addressing this question before we know the Supreme Court's disposition of *Hilton Davis*, and am in general sympathy with the views regarding the doc-

trine of equivalents expressed in the additional remarks, I cannot acquiesce in avoiding the question on the grounds offered here. I believe it is improper and unjust to deny Lough his victory at trial on the question of invalidity under section 102(b), a question properly put to and decided by the jury. (Whether his victory can be sustained on the issue of infringement is not here decided, and I offer no opinion on that question.)

LOURIE, Circuit Judge, additional remarks.

There is another reason why we would exercise our discretion to avoid deciding what appears to be an unnecessary issue of infringement, even though we recognize the value of a complete review of a trial court's decision by an appellate court that is not the court of last resort. That is the current interim uncertainty concerning certain aspects of the law on infringement. The question of infringement in this case was decided by the jury on the basis of both literal infringement and infringement under the doctrine of equivalents. Were we to face these issues, we might well reverse the judgment on the issue of literal infringement on the ground that the upper portion of the Brunswick upper seal assembly does not supportively receive the upper end of the gear shift shaft, an express limitation of the claims. The question of infringement by equivalence would then become critical. Jury instruction under the doctrine of equivalents, however, was rather limited and preceded our recent in banc decision in *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995) (in banc), *cert. granted*, —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). Review of the equivalence finding would therefore be problematical.

The Supreme Court has granted certiorari in *Hilton Davis* and will hear the case in its next term. The Supreme Court has also recently unanimously affirmed our in banc decision in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.1995) (in banc), in which we held that construing the scope of a claim is a matter for the court, rather than the jury. *See Markman v. Westview Instruments,*

*Inc.,* —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The Court based its decision in part on a belief that "[t]he construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis.... The judge, from his training and discipline, is ... more likely to be right, in performing such a duty, than a jury can be expected to be." *Id.* at ——, 116 S.Ct. at 1395 (citing *Parker v. Hulme,* 18 F. Cas. 1138, No. 10,740 (CC ED Pa. 1849)).

Thus, it is entirely conceivable that the Court, consistent with its decision in *Markman,* could hold that determination of the scope of a claim beyond its literal language for purposes of determining infringement under the doctrine of equivalents is also a matter for the judge, not the jury. It could do so on the basis that interpreting a claim arguably contrary to the statutory requirement for precision set forth in 35 U.S.C. § 112 requires the discernment of a judge, tantamount to an equitable reformation of the patent. Deciding the infringement phase of this appeal, when it is not clearly necessary, would thus not be prudent. Such would not be the case, of course, were the infringement question to be dispositive of the appeal, but, as indicated above, it is not here.