**In re James T. HAMILTON.**

No. 89–1069.

United States Court of Appeals, Federal Circuit.

Aug. 16, 1989.

William A. VanSanten, Wood, Dalton, Phillips, Mason & Rowe, Chicago, Ill., argued for appellant. With him on the brief was J. Ray Wood.

Lee E. Barrett, Associate Sol., Office of the Sol., Arlington, Va., argued for appellee. With him on the brief was Fred E. McKelvey, Sol.

Before FRIEDMAN and RICH, Circuit Judges, and BENNETT, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from the July 26, 1988, decision of the Patent and Trademark Office Board of Patent Appeals and Interferences (board) on Hamilton's patent application for a business form. The board sustained the examiner's rejection of six claims under 35 U.S.C. § 102(b) on the ground that the claimed business forms having horizontal perforations were on sale more than one year before Hamilton filed his application. The board reversed the examiner's rejection under § 102(b) of the remaining claims to business forms having vertical perforations, but made a new rejection based on 35 U.S.C. §§ 102(b)/103. We affirm.

## BACKGROUND

Hamilton filed his application September 15, 1981, claiming perforated business forms and tools used to make them. In response to a restriction requirement, he filed a divisional application claiming the tools and, later, a continuation application from the parent claiming the forms. His appeal of the board's decision on the divisional application has been voluntarily dismissed. The application claiming the forms is the one on appeal.

The claimed forms consist of a long sheet or web of paper containing horizontal or vertical lines of fine perforations. These weaken the paper so it may easily be separated into individual form lengths, while the ties of paper between the perforations collectively lend enough strength to the sheet so that it may be processed continuously without breaking apart. The forms purportedly differ from old forms in the size and number of perforations and ties. They are so small in width and so numerous that the forms, when separated, are claimed to have a look and feel similar to pre-cut stationery.

When he conceived the invention, Hamilton was employed by Western Printing Machinery Company of Schiller Park, Illinois, designing and manufacturing rotary die systems. In mid–1979, he learned that perforating dies made with conventional punch-type tooling would not require deburring if they were instead machined using wire electric discharge machining. He also realized that electric discharge machining would allow manufacture of dies having perforating patterns smaller than those conventionally available. Accordingly, Hamilton on August 28, 1979, sent 16 lengths of rule to Majestic EDM Inc. of Bensenville, Illinois, with instructions to machine dies having 72 teeth per inch using the electric discharge process.

Western, Hamilton's employer did not make business forms and had no facilities of its own to test the new dies.

In March 1980, Hamilton, in a conversation with David Schnitzer of Uarco, Inc., a Chicago manufacturer of business forms, mentioned that he had made a perforating die having 72 teeth per inch. He asked Schnitzer whether he had any interest in such a device. When Schnitzer expressed interest, Hamilton said he would give Schnitzer prototypes for examination and test. Schnitzer received two pieces of the 72 teeth per inch die rule from Hamilton on May 6, 1980.

Schnitzer placed the dies in a conventional perforating unit on a business form press at Uarco. He declared that he made "small scale manufacturing tests and pro-

cessibility tests on the resulting business forms." Several test runs of 10,000–20,000 form lengths per run were made at Uarco; Hamilton was present at the first. Schnitzer stated:

The initial tests and evaluations of processibility proceeded satisfactorily and in mid 1980, I was of the belief that testing should proceed to a commercial scale run. Though the initial testing was satisfactory, I had two concerns on a commerical [sic] scale run where the number of individual form lengths could easily exceed 100,000. One concern was that the notches between the perforating teeth in the perforating rule, because they were so small, could pack up with dust from the paper being perforated over the extended length of a commercial scale run and thus gradually render the perforating rule inoperative during the run. A second concern was whether, because the perforating teeth in the rule were so small, the blade itself would hold up through a large scale run of commercial quantities.

Schnitzer's declaration is consistent with Hamilton's statement, which explains that B. Welsch of Uarco called Bruce Kleber of Western on May 16, 1980 "with some cautiously optimistic statements about the test result and expressed interest in further testing and evaluation."

A memorandum from Gary Fitzgibbons of Uarco to Schnitzer dated June 9, 1980 reflects that some tests were deemed successful and that Uarco had identified six "suggested applications" for "the 72 tie per inch horizontal perforation available from Western Printing Machinery." It states:

It is our understanding that tests have already been conducted and successfully completed for 1–Ply forms [the first of the six suggested applications]. We would like to announce its availability, as soon as possible, assuming arrangements for blade supply can be made with W[estern] P[rinting] M[achinery].

Several questions also come to mind. Regarding applications 2 through 6, will additional testing be needed, and if so, when can they be conducted? Can UAR-CO obtain exclusive rights to the use of this perforation?

About the time this was written, Schnitzer traveled to Florida on unrelated business. He met a Uarco salesman, James Renick. Schnitzer mentioned to Renick the new fine tooth perforation die. Schnitzer declared:

I also indicated to Mr. Renick that our initial testing had proceeded to the stage where I'd hoped to obtain a test order of commercial quantity so that I could determine whether my concerns voiced above were of any moment to commercial manufacture and to determine how forms manufactured on a commercial scale could be processed by employees of customers on the customer's forms processing equipment.

Renick subsequently solicited from Christ for the World, Inc. in Orlando, Florida, a so-called "test order" for 309,000 form lengths. The order was obtained on July 25, 1980, several weeks prior to the critical date of September 15, 1980.

Handwritten "Special Instructions" appear on the order form:

Engineering assisted run with special perf blades 72 ties/inch. Call Dave Snitzer [sic] in Barrington. To be present at press set up.

Schnitzer recalled that he wrote the last sentence of this instruction after receipt of the order to indicate that he should be present at the run. He declared:

To the best of my recollection, the Christ for the World test order was run beginning on September 18, 1980 and concluded a few days later. The resulting forms were shipped on or about September 22, 1980.

Approximately one month later, Renick sent Schnitzer some of the "burst," i.e., separated, forms which he had obtained from Christ for the World for evaluation. Renick wrote on one of the forms that the customer had encountered "problems" in folding and "bursting" the forms. Schnitzer then asked a fellow Uarco engineer to evaluate on Uarco's own equipment some of the Christ for the World forms which

Uarco had retained. The results were reported back on December 12, 1980:

> To David Schnitzer, Barrington G.O.
>
> These forms burst and trimmed very well on our 2010 burster with trimmers. This is our tabletop low cost machine. Our bigger machines would process them with no problems also.

Three Uarco internal memoranda authored by J.C. Billimack and dated November 24, 1980, December 19, 1980, and January 2, 1981, reflect that testing of one sort or another continued well past the critical date. The record further reflects that the first request for Uarco's cost accounting people to develop pricing for what Uarco named the "Trim Edge" product occurred on November 21, 1980. Uarco's president authorized commercial offering of the product on January 30, 1981. The first sales bulletin announcing the new product to Uarco personnel for subsequent announcement to the trade was issued February 12, 1981.

## THE BOARD'S OPINION

The board reviewed these facts and decided that the initial tests Schnitzer had run at Uarco constituted a reduction to practice of the business form invention. The board stated:

> [W]e believe that the successful manufacturing test runs within the range of 10,000 to 20,000 form lengths per run clearly demonstrated in mid–1980 that the cutting blade was capable of successfully operating to perforate business forms and that the resulting business forms were satisfactory as to their processibility. Schnitzer's concerns, although they may have had bearing on the length of a prolonged run of equipment using the new perforating blade to produce the claimed business form, in reality related to determining the upper limits of operation of the invention, not to determining whether or not the invention in fact worked satisfactorily. In our opinion, by mid–1980, both the blade and the forms had been reduced to practice.

The board also relied upon Fitzgibbons' June 9th memorandum in reaching this decision. The board characterized the memorandum as the sole piece of contemporaneously authored evidence which mentioned testing and stated: "On its face it indicates the understanding of the person specifically assigned to coordinate marketing and engineering that testing had been successfully concluded."

The board next considered the evidence that Uarco's customary practice in developing new products was to run small scale in-house tests followed by one or more "commercial scale" or "engineering assisted" runs. The board rejected the argument that the Christ for the World "test order" was solicited in an effort to reduce the invention to practice:

> We do not believe that the conduction of "commercial scale" runs indicates that experimentation was continuing in an effort to reduce the invention to practice. We are unable to find any indication that C[hrist] F[or the] W[orld] was informed that it was to receive a test product or that the cost of the product was discounted based on the fact that it was a test product. Although the absence of such information does not of itself establish that Uarco had a commercial rather than an experimental motive in making the sale, that absence is more consistent with a commercial motive than with an experimental motive on the part of Uarco.... [I]t is apparent that the understanding within Uarco itself was that the testing of the 72 teeth per inch cutter and the production of forms by the use thereof had been conducted and successfully completed for one-ply forms. Again, this understanding is consistent with an actual reduction to practice prior to the critical date. Accordingly, we are of the opinion that the solicitation of the order from CFW amounted to a primarily commercially-motivated offer for sale of the successfully reduced-to-practice business forms of this invention prior to the critical date. We are of the opinion that any "experimentation" connected with the "test order" related to manufacturing techniques, rather that to the form itself.

The board also considered the relationship between Hamilton and Western on the one hand and Schnitzer and Uarco on the other and rejected the theory that there was an informal joint venture to develop and test Hamilton's invention.

The board concluded that the offer for sale to Christ for the World of the horizontally perforated forms placed them "on sale" within the meaning of § 102(b) and that the vertically perforated forms would have been obvious in view of what was placed on sale.

## OPINION

An inventor loses his right to a patent if his invention is placed "on sale" more than one year prior to the filing of an application for patent. 35 U.S.C. § 102(b).

■ The patent examiner, relying on evidence Hamilton provided, made a prima facie showing that Hamilton's invention was on sale before the critical date. Hamilton concedes that the horizontally perforated business form was reduced to practice in the test runs of 10,000–20,000 lengths per run at Uarco, and that an offer for sale of the forms was made to Christ for the World on July 25, 1980, prior to the September 15, 1980, critical date.

In view of this, Hamilton's burden before the board was to point to evidence adequate to support the conclusion that the business form was not placed "on sale" within the statute's meaning prior to the critical date. The usual way this is done is to show that the primary purpose underlying the offer for sale was experimental and not commercial. *See, e.g., In re Dybel*, 524 F.2d 1393, 1401, 187 USPQ 593, 598–99 (CCPA 1975); *see also TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed. Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984) (public use). The board decided that Hamilton failed to carry this burden. For the reasons stated below, we agree.

■ The Supreme Court has indicated that for an assertion of experimental use to have merit, it must be clear that the inventor kept control over his invention in the course of its testing. In *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. (7 Otto) 126, 136, 24 L.Ed. 1000 (1877), the Court explained:

When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a *bona fide* intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent.

It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use and not a public use, within the meaning of the statute.

This discussion is addressed to public uses, not sales, but we think the underlying prin-

ciple is the same. The invention may be "put up and used in the premises of another," and the use may even "inure to the benefit of the owner of the establishment," but the invention must be used under the "surveillance" of the inventor, for the purposes of enabling him to "test the machine," to "ascertain whether it will answer the purpose intended," and to "make such alterations and improvements as experience demonstrates to be necessary." In other words, the inventor must keep the invention under his own control.

What is remarkable about the tale of experimental use which has been placed before us in this case is the lack of involvement of either the inventor, James Hamilton, or his employer and assignee, Western Printing Machinery.

Hamilton skirts the issue of control in his main brief and it is raised for the first time by the Solicitor. The Solicitor's brief states that Hamilton should not be entitled to raise experimental use "based on acts of the third party Uarco without first demonstrating control or restrictions (e.g., on secrecy or on use of the blades or forms) between appellant [Hamilton] and Uarco."

In reply, Hamilton states:

While control may be one factor to be considered in determining whether a public use or sale was experimental, it is not the lodestar test for the experimental use exception and certainly is not a matter for threshold determination. Indeed, that public use without restriction is not a bar if for experimental purpose has been determined by this Court[.] [quotation omitted] *In re Smith*, 714 F.2d 1127, 1134[,] 218 USPQ 976] (Fed.Cir.1983).

That Uarco was acting as an agent of WPM and Hamilton (as opposed to an independent third party, as inferred by the Solicitor, Commr. Br. 14), cannot be seriously doubted vis-a-vis the business form. Kleber (App. 65, 66) makes it clear that WPM did not have the facilities to produce perforated business forms whereas Uarco did so that Hamilton sought out Uarco and Schnitzer for that reason in March, 1980. The resulting agency, though not reduced to writing, continued until at least November 1980 (Kleber, App. 66; Schnitzer, App. 58–60; Hamilton, App. 117) and was formalized in December 1980 (App. 66, 117). We address these arguments in turn.

■ First, we may agree with Hamilton that control is not the "lodestar" test in all cases involving experimental use. It is nonetheless an important factor. *American Nicholson Pavement,* supra. The experimental use doctrine operates in the inventor's favor to allow *the inventor* to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application. If it is not the inventor or someone under his control or "surveillance" who does these things, there appears to us no reason why he should be entitled to rely upon them to avoid the statute. *E.g., Magnetics, Inc. v. Arnold Engineering Co.,* 438 F.2d 72, 74, 168 USPQ 392, 394 (7th Cir.1971) ("the experimental use doctrine only lifts the one-year statutory bar where the experimental use is by the inventor or persons under his control").

Second, whether or not control is "a matter for threshold determination," the parties dispute the issue, it is important to the decision of this case, and there is every reason to decide it.

Third, insofar as the *Smith* case is concerned, it does not support the proposition Hamilton attributes to it, nor does it help him in any way. The court in *Smith* rejected a claim of experimental use. The inventors' failure to exercise control over their invention during testing was one reason the case was decided as it was. 714 F.2d at 1136, 218 USPQ at 984.

Fourth and finally, we come to the question of Schnitzer's purported agency. Hamilton raised this argument in a different guise before the board. His theory was that of an "informal joint venture" between Hamilton and Western on the one hand, and Schnitzer and Uarco on the other, to develop the business form invention. The board rejected this theory:

We do not find in the evidence before us anything which would persuade us that such a joint venture actually existed at

the time Uarco offered to buy perforating blades from WPM or at the time Uarco offered for sale to CFW the business forms. The Disclosure Statements of both Schnitzer and Hamilton are signed, respectively, by attorneys Van Santen and Rummler. They do not constitute evidence but instead are merely arguments of counsel. See *In re Pearson,* 494 F.2d 1399, 181 USPQ 641 (CCPA 1974). Hamilton's statement that an agreement was reached between WPM and Uarco toward the end of December 1980, indicates to us that no joint venture existed between WPM and Uarco in mid–1980 or at any time before the critical date (Hamilton Declaration (3), page 2). The Kleber Affidavit (4) is to the same effect: only in November 1980 were negotiations begun with the object of reaching an agreement between Uarco and WPM. Nothing in the other Declarations of Schnitzer, Billimack or Fitzgibbons, or in any of the documents attached to those Declarations, would evidence any joint venture, whether "formal" or "informal". See *J.A. Laporte, Inc. v. Norfolk Dredging Co.,* [787 F.2d 1577, 229 USPQ 435 (Fed.Cir.1986)] *supra.*

Hamilton's theory, recast in terms of agency, is no more persuasive. The documents he relies upon are the same ones the board considered. They do not establish that an agency relationship existed nor do they show that the board's findings are clearly erroneous.

Agency is a consensual relationship in which the agent agrees to act upon the instructions of the principal. What this record shows is that Hamilton spoke to Schnitzer on the telephone and asked him if he had any interest in fine tooth perforating dies. Schnitzer said he did and Hamilton sent him some prototypes. Hamilton's disclosure statement states:

> This material was shipped on May 6, 1980 and subsequently a trial run was made with this material by UARCO. Applicant observed this run and obtained samples.
>
> Mr. B. Welsch, Director of Engineering for UARCO, called on Bruce Kleber

of WPM on May 16, 1980 with some cautiously optimistic statements about the test result and expressed interest in further testing and evaluation. Welsch indicated his opinion that the WPM development was novel and could be of definite interest to UARCO. He suggested that the two companies proceed to investigate the subject on a cooperative basis and that they "keep it under wraps" because UARCO would undoubtedly want to have exclusive rights if the principle proved to be commercially feasible, when put under production conditions, for computer letters and possibly other related forms.

\*    \*    \*    \*    \*    \*

On December 12, 1980 Welsch of UARCO telephoned Bruce Kleber to state that they "produced a couple of jobs and feel that the development is of interest to UARCO, that it is an advancement in the state of the art." Subsequently, arrangements were made for a preliminary meeting to discuss a licensing agreement. This meeting occurred on December 19, 1980.

In addition to this, Schnitzer's declaration states:

> About this time [mid-November 1980], it became the intention of Uarco to prepare to offer a full line of continuous web fine tooth perforated forms and it was decided that a definite agreement should be had with Western Printing Machinery Company for the use and cost of the Hamilton invention and allow some profit to his assignee.

\*    \*    \*    \*    \*    \*

> While my dealings were entirely with Hamilton and from an engineering and production standpoint, the matter of any agreement between Uarco Incorporated and Western Printing Machinery Company with respect to the Hamilton invention was a matter entirely beyond my responsibility and was handled by the respective company officials.

Finally, Bruce Kleber's affidavit states:

> [N]egotiations were begun in November 1980 with the object of reaching a limited

agreement between Uarco Incorporated and Western Printing Machinery Company under which Uarco Incorporated would enter into the commercial production of continuous, individually perforated business forms;

Such an agreement was arranged about the middle of December 1980, and said agreement is still in full force and effect.

These statements do not establish that Hamilton had asked Schnitzer to act as Hamilton's or Western's agent with regard to any business forms made using the dies, or that Schnitzer had consented to do so, prior to the critical date. Nor do they establish that Uarco was acting as Hamilton's or Western's agent; Schnitzer's declaration indicates that he did not have authority to enter into such relationships on Uarco's behalf.

Even if it could be said that Schnitzer was acting in some sense as an agent, there is no showing of what his instructions were or what limitations, if any, were placed on his agency. This record is as susceptible to the interpretation that Hamilton and Western encouraged unrestricted commercialization of the business forms as any other. Beyond Hamilton's presence at the initial 10,000–20,000 form length run at Uarco, there is nothing to show that Hamilton or Western knew or cared what, if anything, Schnitzer was doing in terms of selling or testing the forms. Indeed, the true situation appears to have been that their primary interest was to sell dies, and the forms were the vehicle propelling their sale. In the case of the Christ for the World order, there is no indication that anyone at Western even knew of it. If Schnitzer had been acting as Western's or Hamilton's agent, one would think he would have told them of this so-called test order and reported back concerning its results. But there is nothing to show that he did. Perhaps the whole case is best summed up in the words of Welsch, who called Kleber in December of 1980 to say that Uarco had "produced a couple of jobs

and fe[lt] that the development [wa]s of interest to UARCO."

In summary, the record before us reflects that Hamilton and Western failed to exercise control over the business form invention in the course of its offer for sale to Christ for the World. This tends to show that their motivation was not in fact experimental. The motives of Schnitzer and Uarco, whatever they may have been, cannot, under the facts of this case, be attributed to Hamilton or Western through an agency or joint venture theory. Hamilton has failed to rebut the prima facie showing that the offer to Christ for the World placed his invention "on sale" within the meaning of 35 U.S.C. § 102(b). He does not contest the board's determination that the claims to vertically perforated forms would have been obvious in view of the horizontally perforated forms offered for sale.

The decision of the board is *affirmed*.

AFFIRMED.